**IN THE UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF OHIO**
**WESTERN DIVISION**

| | | |
|---|---|---|
| **DEVOU GOOD PROJECT, INC,** | : | Case No. 1:24-cv-585 |
| **a/k/a GREATER CINCINNATI** | | |
| **COALITION FOR TRANSIT AND** | : | Judge |
| **SUSTAINABLE DEVELOPMENT** | | |
| 311 Elm Street | : | |
| Suite 270 #1134 | | |
| Cincinnati, OH 45202 | : | |
| | | |
| AND | : | **COMPLAINT FOR DECLARATORY** |
| | | **AND INJUNCTIVE RELIEF** |
| **CIVIC CINCINNATI** | : | |
| 1315 Walnut Street #1044 | | |
| Cincinnati, OH 45202 | : | |
| | | |
| AND | : | |
| | | |
| **RIDE THE COV** | : | |
| 321 W. 12th Street | | |
| Covington, KY 41011 | : | |
| | | |
| AND | : | |
| | | |
| **QUEEN CITY BIKE** | : | |
| 1624 Dalton Ave. #14587 | | |
| Cincinnati, OH 45250 | : | |
| | | |
| Plaintiffs, | : | |
| | | |
| | : | |
| v. | | |
| | : | |
| | | |
| | : | |
| | | |
| **UNITED STATES DEPARTMENT OF** | : | |
| **TRANPORTATION** | | |
| 1200 New Jersey Avenue, SE | : | |
| Washington, DC 20590 | | |
| | : | |
| AND | | |
| | : | |

**PETE BUTTIGIEG, SECRETARY OF**　　　　　　　　：
**UNITED STATES DEPARTMENT OF**
**TRANPORTATION**　　　　　　　　　　　　　　：
Office of the Secretary
1200 New Jersey Avenue, SE　　　　　　　　　：
Washington, DC 20590

　　　　　　　　　　　　　　　　　　　　　　：
AND
　　　　　　　　　　　　　　　　　　　　　　：

**FEDERAL HIGHWAY**
**ADMINISTRATION**　　　　　　　　　　　　　：
1200 New Jersey Avenue, SE
Washington, DC 20590　　　　　　　　　　　　：

AND　　　　　　　　　　　　　　　　　　　　：

**SHAILEN BHATT, ADMINISTRATOR**　　　　：
**OF FEDERAL HIGHWAY**
**ADMINISTRATION**　　　　　　　　　　　　　：
Office of the Administrator
1200 New Jersey Avenue, SE　　　　　　　　　：
Washington, DC 20590
　　　　　　　　　　　　　　　　　　　　　　：
AND
　　　　　　　　　　　　　　　　　　　　　　：

**PAMELA BORATYN**
**DIRECTOR OF OHIO DEPARTMENT**　　　　　：
**OF TRANSPORTATION**
1980 West Broad Street　　　　　　　　　　　：
Columbus, OH 43223
　　　　　　　　　　　　　　　　　　　　　　：
AND
　　　　　　　　　　　　　　　　　　　　　　：

**JIM GRAY**
**SECRETARY OF KENTUCKY**　　　　　　　　：
**TRANSPORTATION CABINET**
200 Mero Street　　　　　　　　　　　　　　　：
Frankfort, KY 40622
　　　　　　　　　　　　　　　　　　　　　　：
AND
　　　　　　　　　　　　　　　　　　　　　　：

　　　　　　　　　　　　　　　　　　　　　　：

　　　　　　　　　　　　　　　　　　　　　　：

2

**UNITED STATES ATTORNEY**      :
**GENERAL**
**MERRICK GARLAND**      :
**U.S. DEPARTMENT OF JUSTICE**
950 Pennsylvania Avenue, NW     :
Washington, DC  20530-0001
      :
AND
      :
**UNITED STATES ATTORNEYS'**
**OFFICE**      :
221 E. Fourth Street, Suite 400
Cincinnati, OH 45202     :

      Defendants.      :

## INTRODUCTION

1.     The Brent Spence Bridge currently is an 8-lane double-deck highway bridge on which I-71/I-75 and local/regional traffic crosses the Ohio River between Cincinnati, OH and Covington, KY.  The Brent Spence Bridge Corridor Project is an estimated $3.6 billion federal and state project which includes the following components:

a) Constructing a new double-deck companion bridge west of the existing bridge to carry a total of 10 lanes of Interstate traffic across the River;

b) Reconfiguring the existing bridge to carry 6 lanes of local/regional traffic;

c) Adding several collector-distributor lanes in Ohio and Kentucky to connect and distribute all of the above traffic to and from the bridges, as well as extending frontage roads to accommodate the changed roadway system; and

d) Rebuilding overpass bridges and interchanges in the corridor, which is almost 8 miles in length.

2.     The National Environmental Policy Act, (NEPA), 42 U.S.C. § 4321 *et seq.* requires

federal agencies, and, as here, state agencies acting with the guidance and participation of responsible federal agencies, to prepare an Environmental Impact Statement (EIS) on all major federal actions significantly affecting the quality of the human environment. 42 U.S.C. § 4332(C). An EIS must discuss the environmental effects of the federal action it covers and reasonable alternatives to that action, as well as how those effects can be mitigated.

3.      An agency may begin the environmental review process under NEPA for a project or action by preparing an EIS or may decide to start with preparation of an environmental assessment (EA). 40 C.F.R. §§ 1501.3, 1501.4(a) to (c). The purpose of an EA is to provide sufficient evidence and analysis for determining whether the action presents the potential for causing any significant environmental impacts. If the answer to that question is "no,", then the agency can issue a Finding of No Significant Impact (FONSI), and it does not prepare an EIS. On the other hand, if the project may result in significant impacts, preparing an EIS is necessary. 40 C.F.R. Section 1508.9.

4.      Instead of preparing an EIS to consider, describe, and disclose the impacts of this massive project, as well as reasonable alternatives to it, the Defendants prepared an EA in March 2012, followed by a FONSI in August 2012. In 2015 and 2018 the 2012 FONSI was reevaluated and Defendants concluded that the FONSI remained valid. In January 2024, Defendants released a Supplemental Environmental Assessment (SEA), and after a public comment period, released a Revised Supplemental Environmental Assessment (RSEA) and a FONSI on May 10, 2024.

5.      The RSEA documents a number of the Brent Spence Bridge Corridor Project's impacts:

- 51 acres of land permanently converted to transportation use

- 16 traffic lanes crossing the Ohio River, compared to the present 8 lanes

- About 2.5 acres of impacts to parks, plus temporary impacts

4

- 24 commercial relocations

- About 2.5 acres of wetlands permanently impacted

- 2 acres of permanent stream impacts

- 90 acres of forested habitat impacts, including on foraging/maternity areas for threatened and endangered bat species

- The Project is likely to adversely affect the Indiana bat

- Increased greenhouse gas emissions will result from increased vehicle miles

- Increased ozone pollution will result from increased traffic, and Kenton County is currently in nonattainment for ozone

- Increased soot and fine particulate air pollution (PM2.5) will result from increased traffic, and the concentration of PM2.5 in the area is currently higher than the recently established health standard for PM2.5

- Increased traffic noise will adversely impact over 400 "receptors" who will not be protected by sound barriers because doing so is more costly than the Defendants deem reasonable.

- Increased stormwater quality and quantity problems will occur in an urban area that already suffers from flooding, basement backups, and sewer system overflows.

- There will be adverse impacts on Lewisburg Historic District and Longworth Hall Historic Building

6.      By refusing to acknowledge that the Project will have significant impacts on the human environment, Defendants have arbitrarily and capriciously refused to prepare an EIS, which would require them to meaningfully consider reasonable alternatives, including ones that would include substantial investment in public transportation as part of the Project, or to consider

charging tolls on the Ohio River bridges, which would reduce the demand for the Project's dramatic increase in the number of travel lanes.

7.      Defendants also have failed to adequately consider or mitigate adverse effects on the predominantly non-white residents located near the highway in the project area, including effects on air quality, noise, health and mobility caused by the anticipated 6 years-long construction of the project. They have also failed to adequately consider or mitigate long term effects of expanding these highways, including greatly increased vehicle traffic; water quality and quantity impacts from increased emissions and from the additional acres of highway right of way and impermeable pavement; increased urban sprawl and associated segregation; and the unequal distribution of the benefits and burdens of these transportation system investments.

8.      Plaintiffs Devou Good Project, Inc., a/k/a Devou Good Foundation, a/k/a Coalition for Transit and Sustainable Development, Civic Cincinnati, Ride the Cov, and Queen City Bike therefore bring this action challenging the final approval by the U.S. Department of Transportation (USDOT) and Federal Highway Administration (FHWA) of this Ohio Department of Transportation (ODOT) and Kentucky Transportation Cabinet (KTC) Project.  FHWA's final action approving this huge bridge and highway Project is unlawful because the action was based on a Revised Supplemental Environmental Assessment (RSEA) and a Finding of No Significant Impacts (FONSI) that Defendants prepared and approved without adequate consideration of and recognition of significant Project impacts, including social, racial, economic, land use, environmental, indirect and cumulative impacts; and without adequate mitigation of the impacts that were acknowledged in the RSEA and of those impacts which the RSEA failed to consider.

## I.      JURISDICTION AND VENUE

9.      This action arises under the National Environmental Policy Act (NEPA), 42 U.S.C.

§ 4321 *et seq.* and the Administrative Procedure Act (APA), 5 U.S.C. § 551 *et seq.*

10.     This Court has jurisdiction under 28 U.S.C. §§ 1331 and 1361.

11.     Venue is proper in this judicial district under 28 U.S.C. § 1391(e) because much of the Project is located in this district, the great majority of people who live near the Project and will be most affected by it are located in this district, and a substantial portion of the events or omissions giving rise to the claims occurred in the district.

12.     An actual controversy exists between the parties within the meaning of 28 U.S.C. § 2201(a).

13.     This Court may issue a declaratory judgment and injunctive relief under 28 U.S.C. §§ 2201- 02.

## II.     PARTIES

### A.     Plaintiffs

14.     Plaintiff Greater Cincinnati Coalition for Transit and Sustainable Development ("CTSD"), partners with local nonprofits to assess the unique needs of communities within Greater Cincinnati and to facilitate projects which target the identified needs. Embracing the ideas of artists, philanthropists, and visionaries, it seeks to cultivate vibrant and equitable neighborhoods.  It is a non-stock nonprofit foundation with its principal place of business at 311 Elm Street, Suite 270 #1134, Cincinnati, OH 45202.  CTSD has used and diverted its resources to organize, advocate and educate for improved public transportation and less environmentally and socially harmful streets and highways. CTSD also organizes to seek health equity in the Greater Cincinnati region and has used and diverted its resources to do so. CTSD has submitted comments on this Project, including comments on the SEA, as well as submitting a January 2023 Title VI Civil Rights Act Complaint regarding the Project to the FHWA, which is pending as  Complaint #2023-0134 in the FHWA

Office of Civil Rights.

15. CTSD has been coordinating with residents who live near the portion of the Brent Spence Corridor that is the subject of *this* project, as well as residents in communities that have been greatly affected by the I-75 displacement in the 1950s. Members of CTSD will be adversely affected and injured by this expansion project in numerous ways, including but not limited to adverse effects on the health of their families and enjoyment of life due to increases in noise, air, and water pollution where they live and work. There are also members that will be adversely affected by the land use of this project, including loss of recreation space. The interests of CTSD in this action fall within the zone of interests protected by the laws sought to be enforced in this action.

16. Member Dr. Amy Townsend-Small has lived in Covington since 2021, and currently lives within 1500 feet of the existing highway. As a Covington resident, she and her neighbors are currently negatively affected by indoor and outdoor noise and air pollution from the highway. She also regularly frequents the green space in Covington that will be removed during the project's construction. She is deeply concerned as a resident and environmental science researcher and professor about the expansion of the highway.

17. Plaintiff Civic Cincinnati ("Civic Cincy") is an informal association founded in September 2023 and is a citizen-led group which believes that the city is happier and healthier when it is built for its people and communities. Civic Cincy was inspired by national movements like Strong Towns, Congress for the New Urbanism, and more. Their goals are to be the unified urbanist voice of Cincinnati. The guiding principles of Civic Cincy are people-centric places, thriving local economies, environmental resilience and sustainability, and dignified living for all. Members of Civic Cincy have submitted comments on the Brent Spence project's Supplemental Environmental Assessment. Civic Cincy has its principal address at 1315 Walnut Street #1044, Cincinnati OH

45202. Civic Cincy has diverted its time and resources to educate, inspire, and take action on changing the built environment through advocacy for improved  public and active transportation, and city policies supporting its guiding principles..

18.     Civic Cincy's members live in the Greater Cincinnati region and represent many residents who primarily bike, walk, or use methods of public transport to get around. Civic Cincy also works with members in neighborhoods within a mile of the interstate. and would be affected by any added pollution that the highway would bring to the region.  The interests of Civic Cincy in this action fall within the zone of interests protected by the laws sought to be enforced in this action.

19.     Plaintiff Ride the Cov ("Ride") is an informal association whose mission is to organize, advocate and educate for improved bicycle access and infrastructure, for improved public transportation, and for less environmentally and socially harmful streets and highways.   Its principal place of business is located at 321 W. 12th Street, Covington, KY 41011. Ride has used and diverted its time and resources to further its mission in the Greater Cincinnati area. The highways in the Brent Spence Bridge Corridor harm members of Ride by blocking  bicycle, pedestrian and public transportation access between western and eastern portions of Covington and by failing to provide connections for non-motorized traffic between Covington and Cincinnati, and the expanded Project will form an even wider and more expansive obstacle than the existing highways. The interests of Ride in this action fall within the zone of interests protected by the laws sought to be enforced in this action.

20.     Plaintiff Queen City Bike ("Queen City") is a non-profit dedicated to bringing joy, connection, and empowerment to active mobility in Greater Cincinnati. It creates events and experiences; connects people and neighborhoods; improves access; and develops knowledge and skills. It advocates for an active mobility environment that is safe, equitable, convenient, sustainable,

and imbued with delight—all catalysts and conditions not only for a vibrant culture of biking, walking and rolling, but also for a livable, lovable, thriving, and resilient Cincinnati. Its principal address is 1623 Dalton Avenue #14587, Cincinnati, OH 45250.

21.     Queen City and its members will be harmed by the Project because of i) reduced accessibility and greater travel distances, which together erode cycling as a practical form of transportation; ii) elevated risk of injury or death due to higher traffic volumes and speeds; and iii) greater risk of airway inflammation and lung damage from heightened chronic levels of air pollution. Cycling occurs within the larger infrastructure system, and—like other forms of active transportation—is the proverbial canary in the coal mine for how resilient a community is going to be in the face of climate change. Although highway expansion can offer ephemeral time-savings for car travel, when the infrastructure becomes too vast and/or is poorly designed, it effectively deprives people of their agency to respond to climate impacts. Where do we go from here, when it is no longer safe or practical to walk, roll, bike, or take transit? The BSB Corridor must be an enduring investment for the future, not one that leaves communities stranded and helpless to stop the negative cycle of climate change.  The interests of Queen City in this action fall within the zone of interests protected by the laws sought to be enforced in this action.

**B.      Defendants**

22.     Defendant Pamela Boratyn is the Director of the Ohio Department of Transportation. Her principal place of business is located at 1980 West Broad Street, Columbus, OH 43223. She is sued in her official capacity only.

23.     The Ohio Department of Transportation ("ODOT") is the agency within the State of Ohio primarily responsible for highway planning, funding and construction. Its primary administrative office is located at 1980 West Broad Street, Columbus, OH 43223.

24.     Defendant Jim Gray is the Secretary of the Kentucky Transportation Cabinet.  His principal place of business is located at Office of the Secretary, 200 Mero Street, Frankfort, KY 40622.

25.     The Kentucky Transportation Cabinet ("KTC") is the agency within the Commonwealth of Kentucky primarily responsible for highway planning, funding and construction. Its primary administrative office is located at 200 Mero Street, Frankfort, KY 40622.

26.     In conjunction with ODOT and KTC, FHWA prepared, reviewed and approved the RSEA for the project. ODOT and KTC also held hearings as part of the process of preparing the RSEA.

27.     References to the "state defendants" are to Defendants Boratyn and Gray.

28.     Defendant Shailen Bhatt is the Administrator of the Federal Highway Administration (FHWA), an agency of the U.S. Department of Transportation. He is sued in his official capacity only.

29.     Defendant FHWA is the agency within USDOT primarily responsible for highway planning and funding. The FHWA, in conjunction with the ODOT and KTC, was responsible for preparing, reviewing and approving the RSEA and FONSI in accordance with NEPA.

30.     Defendants Bhatt and FHWA are referred to collectively as "FHWA."

31.     Defendant Peter Buttigieg is Secretary of the U.S. Department of Transportation (USDOT). He is sued in his official capacity only.

32.     Defendant USDOT is the executive department of the federal government responsible for approval of highway projects.

33.     Defendants USDOT and Buttigieg are referred to collectively as "USDOT."

34.     References to the "federal defendants" are to the FHWA and USDOT Defendants.

### III.     FACTUAL BACKGROUND

**A.     Facts Relating to Study Area**

35.     When the Interstate Highway system was constructed through the Greater Cincinnati area, as in many other urban areas, it was significantly routed through minority neighborhoods. Much of Cincinnati's West End neighborhood, then populated heavily by African-Americans, , destroyed, divided, and disrupted by the construction of I-75, which concluded in 1963.  The ODOT application for federal funding of this Project under the Multimodal Project Discretionary Grant program shows that the entire project impact area in the state of Ohio is made up of areas designated as Areas of Persistent Poverty, Historically Disadvantaged Communities, or both. Of note, the West End neighborhood is designated as both a Historically Disadvantaged Community and an Area of Persistent Poverty, and it was this neighborhood that was most severely impacted by the razing of properties during the initial construction of the interstate in the City of Cincinnati.

36.     The Study Area delineated by the Defendants to evaluate Environmental Justice (EJ) impacts of the Project has the effect of diluting impacts on EJ neighborhoods by including in the Study Area numerous higher income, more predominantly white Census Blocks that are relatively remote from the Project's construction corridor.  The RSEA at page 75 sets forth the Defendants' 7EJ Study Area. It diverges as far from the Construction area as approximately 2.5 miles to the east and 2 miles to the southeast to include all of Census Blocks, 35,36, 44, 45, 46, 52, 53, 54, 62, 68. (each of which are designated as non-EJ blocks). Meanwhile, EJ Blocks 1, 4, and 63 line the entire western edge of the Construction zone in Ohio, and all of EJ Block 63 hugs a significant length of the western edge in Kentucky. In Ohio, on the east side of the Construction zone, EJ Blocks 5, 6, 11. 14, and 24 are immediately adjacent to and line the great majority of the Construction zone's length, and EJ Blocks 12 and 13 fall within ¼ and ½ mile east of the Construction zone. In Kentucky, EJ

Blocks 39, 47, and 64 lie immediately adjacent to the east side of the Construction zone, and EJ Blocks 42, 49, 50, 55, 56, 58, 59, 60, 61, 66, and 70 are within ½ to 1 mile from the Construction zone.

37.     The air pollution, noise, and dust impacts from construction of the project, and the impacts from operation of a greatly expanded highway would be much more intense and serious in areas closer to the highway – the area of actual construction and of ultimately increased traffic volumes -- than in areas farther from these activities. The RSEA pays no attention to this and repeatedly simply compares the number of affected EJ and non-EJ blocks in assessing whether impacts on EJ communities are significant or disproportionate.

38.     Construction on the project is expected to last 6 years.

39.     The RSEA anticipates that the construction itself will cause adverse effects, including added construction noise, dust, and air pollution; congestion and disruption of traffic on the Project corridor as well as on connecting highways and surface streets onto which traffic will be diverted.

40.     The burden of those adverse effects will be borne most heavily by the disproportionately non-white residents of the primary study area, who tend to live closer to the highway and to the Construction zone than the better off, proportionately more white residents of the more distant non-EJ Census blocks.

**B.      Facts Relating to Transit Dependence**

41.     There are significant racial disparities in transit dependence in the Metropolitan Statistical Area ("MSA") and region, with persons of color being far less likely than whites to have valid driver's licenses and far more likely than whites to live in "zero vehicle" households.

42.     Persons of color use transit at a higher rate than white persons in the region.

43.     Persons with disabilities in the region are also disproportionately likely to depend

upon public transportation.

44.    Many persons in the region, including a disproportionate number of persons of color and persons with disabilities, depend upon transit to access non-employment services and facilities, including health care, education, shopping, and recreation, as well as for work.

**C.    Facts Relating to Segregation and Isolation of Communities of Color**

45.    Racially disparate forms of residential relocations caused by freeway construction compounded these problems, while highway-induced sprawl paved the way for white flight from Cincinnati.

46.    The project's capacity expansion elements will contribute to and exacerbate suburban sprawl.

47.    That sprawl will perpetuate or exacerbate racial segregation and will adversely affect currently undeveloped agricultural and open space land, with harmful environmental impacts.

48.    Defendants' RSEA and FONSI failed to consider, acknowledge, avoid or mitigate adverse effects of the Project related to racial segregation, transit dependence, and urban sprawl, and does not provide convincing reasons for determining that these effects from the Project are insignificant.  As a result, the FONSI is arbitrary and capricious, and an EIS is necessary to address these effects.

**D.    Facts related to health impacts of the Project**

49.    Years of construction-related dust, air pollution, noise and neighborhood disruption will contribute to adverse health effects on persons in the adjacent neighborhoods, especially in poorer, more non-white neighborhoods where there are more extensive pre-existing health conditions. The Construction zone extends beyond the existing footprint of the highway and will being these disruptive impacts closer to residents living east and west of the existing highway.

14

50.     Traffic-related noise and air emissions resulting from the increased volume of traffic that this Project will cause when completed will also contribute to adverse health effects on persons in the adjacent neighborhoods, especially in poorer, more non-white neighborhoods where there are more extensive pre-existing health conditions. Traffic lanes on the completed Project will exist both east and west of the existing footprint of the highway and will bring these disruptive impacts closer to residents living east and west of the existing highway.  The RSEA and FONSI did not consider these impacts.

51.     Increased air pollution from the expanded highway would also be a significant contributor to increased heart disease incidence, premature death and adverse birth outcomes that have life-long impacts.

52.     As a result of pre-existing adverse health conditions and poverty, the impact of these emissions is not the same for white persons in general as it is for persons of color. It is also not the same for persons who are not poor as it is for poor persons (who are also more likely to be persons of color).

53.     Despite CTSD having presented studies and other information during the comment process regarding the environmental justice characteristics of the EJ Census blocks in the Study Area, Defendants did not conduct either a qualitative or a quantitative analysis of the impacts of the project on EJ Census block residents. Instead, Defendants made unreasonable, arbitrary and unsupported assumptions that the effects on all people near the highway, or on all people in the Study Area would be the same. Because there were more non-EJ Census blocks than EJ Census blocks in the Study Area that they had defined, Defendants concluded that there would not be any disproportionate harm to EJ residents.

54.     Increasing public transit would have beneficial health effects. Public transit is a more

active form of movement. Encouraging walking even short distances to and from transit stops has a cumulative beneficial impact on physical activity and health while decreasing air pollution.

55. Defendants' RSEA and FONSI failed to consider the significance of, and to acknowledge, analyze, avoid or mitigate adverse health effects of the Project, including the racially disparate burdens of those effects.

**E.    Facts Relating to Air Quality**

**a.    Ozone**

56. Kenton County is and has been out of compliance with the health-based National Ambient Air Quality Standards for Ozone, which the RSEA recognizes is an air pollutant emitted by motor vehicles. Ozone causes adverse effects, including damage to tissues in the respiratory tract, increasing coughing, chest tightness, and worsening symptoms of asthma. Asthmatic children using maintenance medications are particularly vulnerable to exposure to ozone.

57. The RSEA acknowledges that the Project will increase traffic volumes in the corridor above the no build projected volumes. The RSEA dismisses this as insignificant, saying that fleet turnover and federal emissions standards will reduce air pollution over time. This, however, completely ignores the fact that the traffic projections for this Project state that traffic volumes on the corridor will increase over time from about 150,000 vehicles per day in 2019 to about 240,000 vehicles per day in 2050, with or without the expansion. That is about a 60% increase.

58. There is no convincing explanation as to why the air pollution from increased traffic, including from the additional new trips that would be induced by expanded highway capacity, is not significant, given that the concentration of ozone in the ambient air is already greater than the health-based federal standards.

59. Moreover, an agency cannot claim that the effect of its project on air pollution is

mitigated by vehicles being required to meet air pollution standards, which is required whether the project is built or not. *Preservation Coalition, Inc. v. Pierce*, 667 F.2d 851 (9th Cir. 1982).

60.    Also, the RSEA fails to evaluate, much less quantify, the health impacts of the additional pollution on people who live, work, attend school, or recreate near the project corridor, particularly on low income and minority persons who already suffer disproportionately from health impacts of ozone and other air pollutants. As a result, it provides no basis for determining that the impacts will be insignificant.

**b.    Soot and fine particulates (PM2.5)**

61.    On February 7, 2024, the United States EPA updated the National Ambient Air Quality Standard (NAAQS) for fine particulate matter or soot (PM2.5), lowering the health-based level from 12 to 9 micrograms per cubic meter., to protect millions of Americans from harmful and costly health impacts, such as heart attack, pulmonary and cardiovascular diseases, and premature death.

62.    During the comment period on the SEA, CTSD informed the Defendants of the EPA's establishment of the 9 micrograms per cubic meter health standard. Nevertheless, the FSEA and FONSI do not address this reduction in the PM2.5 standards, which had long been proposed by EPA, nor the fact that the reported annual concentration of PM2.5 in Cincinnati for 2021 was 10.0 micrograms per cubic meter, which is 11% higher than the new health-based standard, which was also mentioned in CTSD's comments.

63.    The RSEA does acknowledge that the Project will cause PM2.5 pollution to increase by 3% compared to the No Build option but does not address the dramatic increase in vehicle miles traveled -- by about 50% over the next decade and 60% by 2050 -- which it projects for the Project corridor, nor does it address the resulting impact on total emissions of PM2.5 that will result from

that increased traffic.

64.     Defendants were informed that air monitoring results for PM2.5 are available online at IQAir and that as of 3 pm on February 19, 2024, the concentration of PM2.5 in Cincinnati was 11 micrograms per cubic meter, which is 22% above the standard that EPA has established to protect public health.

65.     Since the air quality in Cincinnati fails and has failed to meet the current health-based standards for ozone and PM2.5, protecting the health of local residents requires reductions in emissions of those pollutants rather than expansions of such pollution sources.   Considerably greater reductions are required in neighborhoods adjacent to or relatively close to major sources of these emissions, such as high-volume interstate highways like this section of I-71/I-75.   Thus, anything which would tend to increase PM2.5 emissions must be considered significant.

66.     An accurate assessment of the Project's impact on air pollution, including proper consideration of the current health-based ambient air standard, induced travel demand, and the dramatically increased future traffic volumes predicted by the Defendants is essential to determine the actual impacts of the project. This has not been done, and the RSEA and FONSI do not provide convincing reasons for determining that the potential health impacts of air pollution from the Project are "insignificant."

**c**.     **Disproportionate impact of air pollution on minorities**

67.     Defendants had and were given extensive information on disproportionate effects during the comment process, including U.S. Environmental Protection Agency Environmental Justice Screening Tool maps demonstrating that the Defendants' EJ Census blocks located adjacent or near to the Project in Cincinnati are among blocks with the highest concentrations of minority and low-income residents in the State, and that the EJ Census blocks in both States also

have high percentages of households with no vehicle access. Unsurprisingly, the EPA's maps for Health Disparities, Asthma vs. Nation, Air Toxics Respiratory vs. State, Air Toxics Cancer Risk vs. State, Diesel PM vs. State, Ozone vs. State, and PM2.5 vs. State all reveal similar patterns.

68.     It was therefore arbitrary and unreasonable for Defendants to claim that there is no disproportionate adverse effect from these air pollution impacts of the Project.

**F.     Facts Relating to Water Quality**

69.     The Project would greatly expand the amount of land devoted to highway right of way as well as greatly increasing impermeable surfaces. This will increase the amount of stormwater runoff into adjacent and downstream neighborhoods and bodies of water.

70.     By increasing impermeable surfaces, the Project will also increase the amount of roadway surfaces to which road salt is applied in winter, resulting in increasing levels of chlorides in area waterways. Despite requests from the U.S. EPA and others to Defendants to quantify the projected volumes of runoff and contaminant loads from the Project, this has not been done for chlorides, for toxic metals (which have been found in concentrations much higher than Ohio Discharge Limits in runoff along I-75 in Cincinnati), nor for toxic organic compounds that are commonly found in highway runoff. The EPA recommended numerous other stormwater management recommendations, which were not addressed in the RSEA and FONSI.[1]

71.     By increasing paved surfaces, the project will place additional loads on local and regional sewer systems and increase the likelihood of flooding, basement backups, and discharges of untreated contaminated stormwater into area waterways.

72.     The RSEA and FONSI do not acknowledge or address the fact that adding large areas

---

[1] EPA also expressed concerns "with potentially significant construction and operational air quality and noise impacts on low-income and minority communities that have already experienced longstanding environmental impacts from I-71/I-75. APA is also concerned with impacts from induced travel demand, induced development/growth, and direct and indirect releases of greenhouse gases."

of impervious surface will exacerbate the already existing threat of increased flooding from larger, climate-change induced storms.

73.     The RSEA and FONSI do not acknowledge or address that expanding the highway right of way, even non-impervious surface expansion, will utilize land already needed to manage increasing stormwater flows from the existing highway and from non-highway properties that drain to the Ohio River and other area waterways.

74.     Increased traffic resulting from the Project will also lead to more toxic pollution in stormwater from tailpipe emissions, particulates from engine/motor/brake wear, and from tire wear. Defendants were informed of the acute toxicity of tire additive 6-PPD quinones to salmon, trout, and potentially other aquatic species at extremely low concentrations, and that tire particulates have been found in fish samples nationwide.  Nevertheless, the RSEA and FONSI do not provide any analytical or quantitative information to support a determination that the impact of toxic pollutants from the Project will not be significant.

75.     The years-long construction process will also result in increased amounts of dust, other particulates and toxic pollutants entering the Ohio River and other area waterways in stormwater.

76.     The increase in pollution will harm the environment and will impair the health of the aquatic ecosystem.

77.     The increase in pollution will impair recreational uses of the Ohio River.

78.     The RSEA and FONSI address mitigation of water impacts of the Project largely in vague and general terms, often by simply listing concepts or approaches to deal with stormwater, but without quantification or analysis, and do not include enforceable commitments to provide mitigation that corresponds to the nature and magnitude of those impacts.  For those reasons, the

Defendants have failed to provide "convincing reasons" that the water impacts of the Project will be "insignificant."

**G.    Facts relating to induced travel demand**

79.    The RSEA asserts that constructing 16 highway lanes crossing the Ohio River, and numerous miles of added travel lanes on both sides of the Ohio River, ending up with as many as 20 parallel lanes in the Project corridor where only 10 currently exist, will lead to traffic volumes in 2050 that will be only 1.7% higher than the no-build option.  Defendants have all but closed their eyes to the long-understood existence of induced demand.  That is, "If you build more highway capacity, they will come and use it."  For a time, congestion will ease, and more and more people will decide to get in their vehicles and use that added capacity – taking longer or entirely new trips that would not have occurred if additional lanes had not been constructed and made available for free to motorists.

80.    CTSD's comments on the SEA informed Defendants about an Induced Travel Calculator developed by the National Center for Sustainable Transportation at the Institute of Transportation Studies at the University of California, Davis.  Using that calculator, CTSD calculated that the Project's added capacity would result in induced traffic amounting to about 136 million vehicle miles traveled per year. Defendants' FONSI failed to address this information indicating that induced travel from the Project would be huge and certainly not insignificant.

**H.    Facts relating to climate change**

81.    The RSEA and FONSI assert that the greenhouse gas emissions resulting from the Project are insignificant.  However, they fail to reasonably address greenhouse gas emissions and the impact of the Project on climate change, by failing to include the huge amount of induced traffic resulting from the Project's added capacity.

82.     In addition, a huge amount of greenhouse gas emissions will result simply from construction of the project – those resulting from producing and transporting concrete, steel, asphalt, and other materials to the site, fueling the heavy equipment used to demolish existing infrastructure and to construct the billions of dollars of new infrastructure, operating lighting for night construction, and the like. Those emissions will be front-loaded, occurring during the first 6 years, and those emissions will remain in the atmosphere for as long as a century or more.  Carbon dioxide will remain in the atmosphere for centuries, increasing the warming of the earth year after year after year. As a result, the impact in the year 2031, 2041, or 2051 of a ton of $CO_2$ emitted in 2025 will be almost 5, 15, or 25 times the impact in those years of a ton that will not be emitted until 2030, 2040, or 2050.  Thus, it is likely that the impact of the construction emissions will be much greater than the emissions from vehicles that will be travelling on the expanded highway decades in the future. Nevertheless, the construction emissions are not even mentioned in the FSEA and FONSI.

83.     Defendants minimize the impact of the greenhouse gas emissions resulting from the Project by pointing to federal fuel efficiency and exhaust emission standards and gradual replacement of current vehicles by newer vehicles with lower emissions, but those reductions over time result from factors that are entirely independent of this Project, and will be undone and overtaken by the dramatically higher traffic volumes which Defendants have forecast for the Project in the future.

84.     Moreover, Defendants have failed to acknowledge that climate change has been recognized by both state and federal governments as disproportionately harming low-income and minority communities.

85.     The RSEA and FONSI fail to acknowledge or take account of the urgent need to reduce greenhouse gas emissions in order to reduce or avoid extremely harmful consequences of

climate change that are already taking place and will get worse in the future. Instead of reducing greenhouse gas emissions, which is what both the human environment and the natural environment need, Defendants' decision to approve this highway expansion Project will greatly increase them. That cannot fairly be characterized as "insignificant."

**I.  Facts Relating to Mitigation**

86.  Defendants did not adequately or meaningfully address mitigation of the adverse effects of the Project.

87.  For example, in determining that there will not be adverse air quality effects on people living near the highway, Defendants failed to account for pollution generated by increased or induced traffic and relied on speculative conclusions regarding reduced per mile emissions from vehicles in the future.

88.  In addition, Defendants failed to adequately avoid, minimize or mitigate adverse effects on the predominantly non-white residents located near the highway in the EJ Census blocks of the primary study area.

89.  Defendants concluded, but without reasoned analysis, that there are no significant and no disproportionate effects on those residents. They arbitrarily and unreasonably assumed, for example, that all people in the Project Study Area would suffer adverse effects to the same degree, whether they lived adjacent to the highway or two or more miles away. Defendants then used the purported lack of disproportionate adverse effects to claim that mitigation was not required.

90.  Similar problems pervade the RSEA's and FONSI's' environmental justice analysis.

**J.  The Project's Environmental Review Process**

91.  As noted above, a FONSI was originally issued regarding the Project in 2012, and Defendants reevaluated it in 2015 and 2018 and concluded that the FONSI remained valid. In

January 2024, Defendants released a Supplemental Environmental Assessment (SEA), and after a public comment period, they released a Revised Supplemental Environmental Assessment (RSEA) and a FONSI on May 10, 2024.

92.     On May 15, 2024, FHWA's "Notice of Final Federal Agency Actions on Proposed Transportation Project in Ohio and Kentucky" (Notice) was published in the *Federal Register*, at 89 Fed. Reg. 42572. The notice announced final FHWA action granting approval of the Brent Spence Bridge Corridor Project, and referred to the SEA, the FONSI, and other documents in the administrative record for a description of the agency's actions on the project.

## IV.     THE LEGAL FRAMEWORK

93.     The Federal Aid Highway Act (FAHA), 23 U.S.C. § 109(h), mandates that any "possible adverse economic, social, and environmental effects relating to any proposed project on any Federal-aid system have been fully considered in developing such project, and that the final decisions on the project are made in the best overall public interest, taking into consideration the need for fast, safe and efficient transportation, public services, and the costs of eliminating or minimizing such adverse effects and . . . (1) air, noise, and water pollution; (2) destruction or disruption of man-made and natural resources, . . . community cohesion and the availability of public facilities and services; (3) adverse employment effects, and . . . (5) disruption of desirable community and regional growth."

94.     NEPA requires federal government agencies, and, as here, state agencies acting with the guidance and participation of the responsible federal officials, to prepare an EIS on all major federal actions significantly affecting the quality of the human environment. 42 U.S.C. § 4332(C).

95.     An agency that prepares an EA and then determines that a project or action will not result in any significant impacts and issues a FONSI instead of proceeding to prepare an EIS "must

make a convincing case that the impact is insignificant." *Maryland-National Capital Park & Planning Commission v United States Postal Service*, 487 F.2d 1029, 1040 (D.C. Cir. 1973).

96. An EA can never substitute for preparation of an EIS, if the proposed action could significantly affect the environment. *Anderson v. Evans*, 371F.3d 475, 494 (4th Cir. 2004).

97. If the project may cause a significant degradation of some human environmental factor . . . the court should require the filing of an impact statement. *Save Our Ten Acres v. Kreger*, 472 F.2d 463, 467 (5th Cir. 1973); *Ocean Advocates v. U.S. Army Corps of Engineers*, 402 F.3d 846 (9th Cir. 2005).

98. An agency can reduce impacts to a level where they are no longer significant. *National Parks & Conservation Ass'n. v. Babbitt*, 41 F.3d 722 (9th Cir. 2001). However, the mitigation measures cannot be hypothetical and speculative. *Forest Service Employees for Environmental Ethics v. U.S. Forest Service,* 726 F.Supp.2d 1195 (D. Mont. 2010). A perfunctory description or mere listing of mitigation measures without any analytical data is not enough for a finding of no significant impact. *Ohio Valley Environmental Coalition v. Hurst*, 604 F.Supp.2d 860 (S.D. W.Va. 2009); *Citizen Advocates for Responsible Expansion, Inc. v. Dole*, 770 F.2d 423 (5th Cir. 1985).

99. NEPA requires federal agencies to "utilize a systematic, interdisciplinary approach which will ensure the integrated use of natural and social sciences and the environmental design arts in planning and in decisionmaking which may have an impact on man's environment." 42 U.S.C. § 4332(A); 40 C.F.R. § 1502.6 (1978).[2]

100. The agency must "take a hard look" at environmental consequences. *Kleppe v. Sierra Club*, 427 U.S. 390, 410 n. 21 (1976).

---

[2] Because the NEPA process was begun before September 14, 2020, the prior version of the Council on Environmental Quality (CEQ) regulations (40 C.F.R. Parts 1500-1508), promulgated in 1978, applies. 40 C.F.R. § 1506.13 (2020).

101. Regulations promulgated by the federal defendants, which supplement the CEQ regulations, also state that it is the government's policy that "[a]lternative courses of action be evaluated and decisions be made in the best overall public interest based upon a balanced consideration of the need for safe and efficient transportation; of the social, economic, and environmental impacts of the proposed transportation improvement; and of national, State, and local environmental protection goals." 23 C.F.R. § 771.105(c); *see also* 23 C.F.R. § 771.101.

102. Regulations promulgated by the federal defendants also state that "No person, because of handicap, age, race, color, sex, or national origin, be excluded from participating in, or denied benefits of, or be subject to discrimination under any Administration program or procedural activity required by or developed pursuant to this part." 23 C.F.R. § 771.105(g).

103. An EIS must meaningfully evaluate alternatives to a proposed action, 42 U.S.C. § 4332(C)(iii), and must "study, develop, and describe appropriate alternatives to recommended courses of action in any proposal which involves unresolved conflicts concerning alternative uses of available resources." 42 U.S.C. § 4332(E). An EIS must "rigorously explore and objectively evaluate all reasonable alternatives, and . . . [d]evote substantial treatment to each alternative considered in detail . . . so that reviewers may evaluate their comparable merits." 40 C.F.R. § 1502.14(a), (b) (1978).

104. An EIS must include the alternative of no action, must include reasonable alternatives even if not within the lead agency's jurisdiction, and must include appropriate mitigation measures not already included in the proposed action or alternatives. 40 C.F.R. §§ 1502.14(c), (d), (f) (1978).

105. This analysis will be irreparably skewed by a failure to adequately consider either reasonable alternatives or the consequences of the proposed action.

106. An EIS must evaluate the effects of the proposed project. "Effects and impacts as

used in these regulations are synonymous. Effects includes ecological . . ., aesthetic, historic, cultural, economic, social, or health [effects], whether direct, indirect, or cumulative." 40 C.F.R. § 1508.8 (1978)

107.    An EIS must take a "hard look" at indirect effects and their significance. *See also*, 40 C.F.R. §§ 1508.8(b), 1502.16(b) (1978). Indirect effects are those that are "caused by the action and are later in time or farther removed in distance [than direct effects], but are still reasonably foreseeable." 40 C.F.R. § 1508.8(b) (1978). Indirect effects "include growth inducing effects and other effects related to induced changes in the pattern of land use, population density or growth rate, and related effects on air and water and other natural systems, including ecosystems." *Id*. In evaluating issues such as land use and growth patterns, an agency "cannot simply assume that development will occur at the same pace whether or not [D]efendants yield to the demand for more roads." *Highway J Citizens Group v. USDOT*, 656 F.Supp.2d 868, 887 (E.D. Wis. 2009).

108.    An EIS must evaluate "[u]rban quality, historic and cultural resources, and the design of the built environment, including the reuse and conservation potential of various alternatives and mitigation measures." 40 C.F.R. § 1502.16(g) (1978).

109.    An EIS must take a hard look at cumulative impacts. 40 C.F.R. § 1508.25 (1978). A "cumulative impact" is "the impact on the environment which results from the incremental impact of the action when added to other past, present and reasonably foreseeable future actions regardless of what agency (Federal or non-Federal) or person undertakes such other actions. Cumulative impacts can result from individually minor but collectively significant actions taking place over a period of time." 40 C.F.R. § 1508.7 (1978). The goal is to highlight negative impacts or effects that might occur if the minor effects of multiple actions accumulate over time.

110.    An EIS must "[i]nclude appropriate mitigation measures not already included in the

proposed action or alternatives" 40 C.F.R. § 1502.14(f) (1978) and "[m]eans to mitigate adverse

environmental impacts." 40 C.F.R. § 1502.16(h) (1978); *see also* 23 C.F.R. § 771.109(d).

111.    "Mitigation" includes:

    (a) Avoiding the impact altogether by not taking a certain action or parts of an action.

    (b) Minimizing impacts by limiting the degree or magnitude of the action and its implementation.

    (c) Rectifying the impact by repairing, rehabilitating, or restoring the affected environment.

    (d) Reducing or eliminating the impact over time by preservation and maintenance operations during the life of the action.

    (e) Compensating for the impact by replacing or providing substitute resources or environments.

40 C.F.R. § 1508.20 (1978). Thus, mitigation is not limited to mitigation of traffic congestion

during construction.

112.    Mitigation can include "incorporating some form of transit into the project." *MICAH*

*v. Gottlieb,* 944 F.Supp.2d at 670.

113.    The APA, 5 U.S.C. § 551 *et seq.*, requires that federal agency actions and decisions

follow all statutorily prescribed procedures and comply with all applicable laws. The APA also

requires that a reviewing court hold unlawful and set aside any agency action if it fails to meet

statutory, procedural or constitutional requirements or if it was arbitrary, capricious, an abuse of

discretion, or otherwise not in accordance with law. 5 U.S.C. § 706(2)(A).

114.    The APA authorizes federal courts to enjoin agency activity if it fails to meet

statutory, procedural or constitutional requirements or if it was arbitrary, capricious, an abuse of

discretion, or otherwise not in accordance with law.

115.    The federal and non-federal participation in this project, including but not limited to

federal financial assistance for the project, is sufficiently interrelated to constitute a major federal action for NEPA purposes.

## CLAIM FOR RELIEF: VIOLATION OF NEPA
### (Inadequate Analysis of Effects)

116.    Plaintiffs reallege and incorporate paragraphs 1 through 115 above.

117.    The RSEA and FONSI prepared, reviewed and approved by the State Defendants and the federal Defendants violate NEPA by failing to adequately identify, disclose, study or mitigate the effects and impacts of the Project on the natural and human environments in the region, including but not limited to:

      a.    Social, health and racial effects, including cumulative effects, of failing to improve and expand transit, especially in light of the historical disruption of Cincinnati's West End minority neighborhoods when I-75 was constructed, and the known racial disparities in lack of access to private vehicles in the region;

      b.    Land use, and associated social, cultural and racial effects, especially cumulative effects, including but not limited to facilitation of further suburban and exurban growth patterns ("sprawl"), facilitation or perpetuation of racially segregated residential land use patterns, the relocation of jobs and businesses from older, developed urban areas with significant minority populations to less developed, predominantly white, parts of the region, and/or the exclusion of transit-dependent workers from parts of the region where greater job growth is occurring;

      c.    Adverse health impacts resulting from years of construction, and from the increased volumes of traffic, including new induced traffic that will result from the Project's expansion of capacity, and/or from inadequate provision of transit alternatives, and the extent to which any such effects are disproportionately borne by persons of color;

29

d.     Adverse impacts on the human and natural environment, including but not limited to cumulative effects from air pollution, from greenhouse gas emissions that would result both from the construction of the expanded highway Project and from the increased volume of vehicle traffic that it would cause;

e.     Community, neighborhood, economic development, employment, and local economic effects, especially on underemployed and unemployed, isolated and transit-dependent communities of color in Cincinnati and Covington and users of parks near the project area, including the impact of taking over 50 acres of land for residential displacements and impacts to parks, churches and medical facilities;

f.     Impacts on water volume and quality, and associated impacts such as flooding, basement backups, sewer overflows, or discharges of untreated contaminated highway runoff,  including impacts on nearby and downstream waterways and communities or  local and regional sewer systems, from the increased runoff and pollution likely to occur as a result of  the Project's significantly expanded impermeable pavement surface as well as a result of the increase in traffic volume which the Project will cause;

g.     Multiple adverse effects, including but not limited to cumulative social and economic effects, on communities of color who disproportionately live adjacent to or near the Project's travel lanes, including but not limited to health and pollution effects, including noise pollution, adverse effects of urban sprawl, and adverse effects of expending limited public funds on this project in lieu of and without including critically needed public transportation projects.

118.    Some of these effects of the Project were not considered or addressed at all by the RSEA and FONSI.  Others were referred to in the RSEA or FONSI but were characterized as

insignificant without Defendants performing a reasoned analysis or quantification to support that conclusion. Other effects were quantified, but erroneously, or in ways which failed to acknowledge or describe their actual adverse impacts, such as illnesses or premature deaths resulting from air pollution, or lethal impacts on aquatic life resulting from water pollution.

119.    The RSEA and FONSI describe a variety of impacts of the Project which are individually significant in nature and scale.  Several of the items in Paragraph 5 of this Complaint easily fall into that category. Take, for example, the following impacts in the urbanized Cincinnati area:

- 51 acres of land permanently converted to transportation uses

- 90 acres of forested habitat impacts, including on foraging/maternity areas for threatened and endangered bat species

- Increased ozone pollution will result from increased traffic, and Kenton County is currently in nonattainment for ozone

- Increased soot and fine particulate air pollution (PM2.5) will result from increased traffic, and the concentration of PM2.5 in the area is currently higher than the recently established health standard for PM2.5

- Increased traffic noise will adversely impact over 400 "receptors" for whom the increased noise qualifies them to be considered for protection by sound barriers but will not be protected because doing so is more costly than the Defendants deem reasonable.[3]

- Increased stormwater quality and quantity problems in an urban area that already suffers from flooding, basement backups, and sewer system overflows.

---

[3] The RSEA and FONSI do not acknowledge that chronic traffic noise is not only unpleasant, but represents a serious health hazard for nearby residents.

120.    Defendants concluded that each and every one of these impacts will be mitigated to the extent that any residual impact will be insignificant.  However, those conclusions were not supported by reasoning or analysis, and the nature and scale of the proposed mitigation do not correspond to the nature and sale of the impacts, with the result that impacts that are significant in nature and scale remain unmitigated.

121.    Moreover, a number of impacts that might individually be considered insignificant can cumulatively amount to a significant impact on the natural or human environment, and the cumulative impacts of the many impacts which the Defendants have recognized, including those which Defendants mitigate only in part, require a finding that approval of the Brent Spence Bridge Corridor is a major federal action which significantly impacts the human environment, for which preparation of an EIS is required.

122.    For all of the above reasons, the Defendants' approval and issuance of the RSEA and FONSI for this Project was arbitrary and capricious and not in accordance with law.

123.    Plaintiffs are harmed by Defendants' wrongful issuance of a FONSI, which has resulted in Defendants proceeding forward with this massive and environmentally and socially harmful Project without taking the "hard look" at reasonable alternatives and without providing a comparison of their respective impacts that preparation of an Environmental Impact Statement would provide.

**RELIEF REQUESTED**

WHEREFORE, Plaintiffs respectfully request that this Court:

a.    Declare that the federal Defendants and Defendants Boratyn and Gray have failed to comply with NEPA by arbitrarily and capriciously issuing a FONSI, rather than preparing an EIS, despite the significant adverse impacts which the RSEA and Defendants' own records demonstrate

are likely to result from the Project, and without mitigating or sufficiently mitigating those significant impacts.

      b.   Declare that the Defendants' FONSI which approved Brent Spence Bridge Corridor Project was arbitrary, capricious, an abuse of discretion, and otherwise not in accordance with law;

      c.   Issue an order vacating the RSEA and FONSI and Notice pertaining to the project and remanding the RSEA, FONSI, and Notice to Defendants for the purposes of curing their violations of NEPA and the APA;

      d.   Issue an order vacating any project agreement authorizing the use of federal funds for the Project pursuant to 23 U.S.C. § 106(a);

      e.   Grant preliminary and permanent injunctions barring Defendants from taking any action that in any manner supports or funds the design, property acquisition, construction, or development of the Project until the violations of NEPA and the APA have been cured;

      f.   Award Plaintiffs reasonable attorney fees, costs, expenses, and disbursements associated with this litigation; and

      g.   Grant such other or further relief as authorized by law and as this Court may deem just and proper.

Respectfully submitted,

/s/ David A. Eberly
David A. Eberly (0067007)
Eberly McMahon Copetas LLC
2245 Gilbert Ave. Suite 101
Cincinnati, OH 45206
513-533-1151
513-533-3554 Fax
deberly@emclawyers.com
*Attorneys for Plaintiffs*

<u>Of counsel:</u>
Dennis M. Grzezinski (WI Bar No. 1016302)
LAW OFFICE OF DENNIS M GRZEZINSKI
1845 N. Farwell Avenue, Suite 202
Milwaukee, WI 53202
414-530-9200
dennisglaw@gmail.com